# Richmond

PAUL DEAN PHIPPS

v.

RANN INDUSTRIES, INC.,

and

HANOVER INSURANCE COMPANY

No. 0956-92-2

Decided May 18, 1993

COUNSEL

Gary W. Kendall (Michie, Hamlett, Lowry, Rasmussen & Tweel, P.C., on brief), for appellant.

Bevin R. Alexander, Jr. (Edmunds & Williams, P.C., on brief), for appellee.

OPINION

**BENTON, J.**—Paul Dean Phipps appeals from a decision denying him workers' compensation benefits. He contends that the commission applied an improper standard in determining that his actions constituted willful misconduct. For the reasons that follow, we reverse the order denying benefits.

I.

Phipps, who was nineteen years of age, was employed as a utility person for Rann Industries and had been working only thirty days prior to the incident at issue. His job required him to carry boxes and clothing between a building that contained Rann's showroom and Rann's warehouse building.

Two days prior to the incident at issue, a ramp outside the rear door of the showroom building was painted with a high gloss paint. The day after the ramp was painted, the ramp became slick because of rain. After an employee, Sandra Shelton, fell on the ramp and injured her back, Sue Hairfield, the warehouse manager and supervisor, assembled all her employees and "told everyone at this time not to use the ramp, and . . . to use the office entrance to exit and to come in until the ramp was dry or we could do something about it, you know, to repair it."

Hairfield also instructed Phipps and Thomas Nagle to make signs to put on the door. She instructed them "to make a sign so that people would be very cautious . . . using the ramp." Phipps' sign stated, "Caution, Ramp Slick," and it contained a picture of a woman falling. That sign was placed inside the stockroom on the door leading out to the ramp. Nagle's sign read, "Caution, Ramp Slick," and was placed on the outside of the same door.

The next day Phipps was required to take clothing to the warehouse across the street. He used a cart to carry four boxes each weighing

forty pounds. When he left the showroom building, he went out the back door and slipped on the ramp. As he fell, the hand cart struck him and injured his back.

The deputy commissioner held that the evidence proved that Phipps was injured because of his own willful misconduct in violation of a safety rule. On review, the commission affirmed the decision.

## II.

The elements of the defense of willful misconduct are statutorily stated as follows:

No compensation shall be awarded to the employee . . . for an injury or death caused by:

1. The employee's willful misconduct or intentional self-inflicted injury;

\* \* \* \*

5. The employee's willful breach of any reasonable rule or regulation adopted by the employer and brought, prior to the accident, to the knowledge of the employee. . . .

Code § 65.2-306.

■ To successfully raise a defense of willful misconduct, the employer must establish (1) "that the safety rule was reasonable, (2) that the rule was known to [the employee], (3) that the rule was for [the employee's] benefit, and (4) that [the employee] intentionally undertook the forbidden act." *Spruill v. C.W. Wright Constr. Co.*, 8 Va. App. 330, 334, 381 S.E.2d 359, 360-61 (1989). Proof of negligence will not support the defense.

> Willful misconduct requires something more than negligence. " 'Willful' . . . imports something more than a mere exercise of the will in doing the act. It imports a wrongful intention."

*Uninsured Employer's Fund v. Keppel*, 1 Va. App. 162, 164, 335 S.E.2d 851, 852 (1985) (quoting *King v. Empire Collieries Co.*, 148 Va. 585, 590, 139 S.E. 478, 479 (1927)).

Hairfield's verbal instructions to the employees is Rann's basis for asserting the existence of the safety rule and the limits of the safety rule. However, Hairfield's own testimony demonstrates the ambiguous

nature of her instructions. Her testimony concerning those instructions was as follows:

A.   On the day that Mrs. Shelton fell. I told everyone at this time not to use the ramp, and that if they — to use the office entrance to exit and to come in *until the ramp was dry* or we could do something about it, you know, to repair it.

* * * *

Q.   During your meeting with the employees, did you tell them not to ever go in and out the door or did you specify what kind of activities that they could do going in and out of the door.

A.   I told them *at the time* not to use the ramp, to use the office entrance and exit from the office, which was no problem. It was a hall, straight hall, from our warehouse straight down the hall to the outside door of the office (emphasis added).

This evidence proved that the instructions announced by Hairfield only warned the employees not to use the ramp when it was wet. Only by ignoring Hairfield's testimony could one conclude that the instructions barred employees from using the exit no matter what the weather might have been.

Even if the commission could have found as a fact that Hairfield announced a clear, unambiguous policy in the meeting with the employees, Hairfield's testimony proved that she gave Phipps further instructions that countermanded any certainty that may have been conveyed in the meeting. During or immediately following the meeting, Hairfield instructed Phipps and Nagle to make signs for the door. She testified:

Mr. Phipps made one sign and Mr. Nagle made the other. Mr. Phipps' sign said, "Caution, Ramp Slick," and he drew a picture of a lady falling. And, he put this on the inside door and Mr. Nagle made a "Caution, Ramp Slick," on the outside door so it was covered both ways, in and out.

Hairfield did not instruct Phipps or Nagle to make a sign forbidding the use of the doors to the ramp. The signs, which are the only written manifestation of the instructions that Hairfield announced in the meeting, do not support Rann's contention that the employees were barred from using the ramp. Moreover, Hairfield's testimony proved that the signs reflected her instructions.

Q. Well, what were your — to the best of your recollection, what were your specific instructions about the sign?

A. Oh Gee! I don't know, I don't really remember, I just told them to make a sign so that people would be very cautious with using the ramp.

This evidence proved that the instructions communicated to Phipps that he should exercise caution when using the ramp. The evidence does not prove that, in making the decision to use the back door to carry the boxes to the warehouse, Phipps was incautious or "intentionally undertook [a] forbidden act." *Spruill*, 8 Va. App. at 334, 381 S.E.2d at 360-61. On the day following the meeting and the posting of the signs, the weather was drizzly. The evidence also proved that Hairfield agreed that "whether the ramp was wet or not for anybody would be a judgment call."

When Phipps slipped on the ramp, he had been directed by Nagle, the shipping clerk, to take the clothing to the warehouse. He said that Nagle told him to use the back door and said, "just be careful when you go out." Phipps also testified about a warning Nagle had given him on an earlier occasion regarding entering the main office where the salespeople worked:

I had just got jumped on previously for going through that door, by Thomas Nagle. He said that . . . nobody [was] supposed to go through there unless they were asked to go through.

The commission cited this testimony and several other instances in which it believed Phipps contradicted other witnesses. We have reviewed those instances and we conclude that the commission misconstrued the testimony. Phipps' testimony concerning Nagle's warning was consistent with Sandra Shelton's testimony that warehouse people were not generally permitted to go through the showroom and office areas. She stated:

Q. If you needed a load of materials to go out of the warehouse, would it be customary to go through the office?

A. No.

Q. And, if you did that, would somebody tell you not to?

A. Yes.

The commission also stated that Phipps "contradicted Sandra Shelton's testimony that she got hurt at break time." Phipps testified that Shelton slipped during the break. However, Shelton did not contradict that testimony. She testified that "at break time, I went out on the ramp and slipped and fell." She was later asked:

Q: How long were you gone [to the doctor's office]?

A: About an hour.

Q: So, you were injured around lunchtime?

A: It was on my break and [Hairfield] had to get me an appointment.

Q: What time was that, roughly?

A: I believe it was — maybe after lunch, and I went to the doctor. I think it took him forty-five minutes. I went right back to work.

Hairfield stated that Shelton fell during lunchtime. Thus, it was Hairfield who gave the conflicting testimony.

In addition, the commission commented adversely upon Phipps' testimony that Nagle's warning influenced him. We believe that the record demonstrates that the commission also misconstrued the import of Phipps' testimony in that regard. Hairfield testified that she was Phipps' supervisor. Phipps agreed and identified her as his "immediate supervisor." He further testified:

Q. But, you had only been on this job for thirty days?

A. That's right, sir.

Q. Now, you indicated that Thomas Nagle is your supervisor?

A. No sir. Sue Hairfield was my supervisor. I worked under Thomas Nagle.

Q. Now, who is Thomas Nagle?

A. He is the owner's son, the owner of the corporation. He's his son.

\* \* \* \*

Q. So, this Thomas Nagle was the owner's son?

A. That's right, sir.

Q. I take it he was not a co-worker of yours, in other words, on the same level?

A. Well, being the boss's — I mean, the employer, the main man's son, I didn't, you know, look at him as being a co-worker. I looked at him more as being a foreman type person.

This testimony does not contradict Hairfield's testimony. She testified that she was Phipps' "boss." She had told Phipps that if he had no specific assignment, he was to sweep the floor or assist Nagle, if Nagle needed help. Phipps testified that Hairfield was his supervisor but he considered Nagle, the owner's son, to be "a foreman type person." His perception that Nagle had authority over him was not without foundation. Not only was Nagle the owner's son, but he had on occasion given instructions to employees in Hairfield's absence. Indeed, Hairfield testified:

Q: And, if stockroom [employees] should finish up a job, does Tom Nagle from time to time, tell other employees what they need to move onto next because he's more experienced and knows what to do?

A: If I leave instructions for him, yes. If not he comes and calls me. He pages me.

That Nagle, who Phipps perceived to be a foreman, had warned him not to enter the front office where salespeople were dealing with customers sheds light upon Phipps' state of mind. Phipps was a nineteen year old employee who had been working at the establishment for only thirty days. This evidence tends to prove that Phipps was confronted with the knowledge that he had on previous occasions been warned about going into the showroom, that he was aware that the ramp was slippery and required caution if it was to be used, and that he had been directed to transfer clothing to the warehouse through the back door of the showroom by the very person who had earlier warned him about entering the showroom. At worst, Phipps erred in balancing the directions he had received about the manner in which he was to carry out his duties.

Significantly, no barrier had been placed in front of the door to deter its use. Likewise, the sign that was placed on the door did not, by its terms, forbid employees from using the door. The signs merely advised cautious use. Thus, the evidence failed to prove that a safety rule barred Phipps from using the ramped exit, and further, the evidence failed to prove that Phipps acted with wrongful intention. "The claimant did not intentionally or willfully commit an act with knowledge of a known hazard. Negligence, regardless how gross, does not bar a recovery for workers' compensation benefits." *Uninsured*, 1 Va. App. at 164-65, 335 S.E.2d at 852.

Accordingly, we reverse the decision denying Phipps an award.

*Reversed.*

Elder, J., and Cole, J.,* concurred.

---

* Retired Judge Marvin F. Cole took part in the consideration in this case by designation pursuant to Code § 17-116.01(C).